UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
MAXIE JAMES,                                    :
                                                :
                              Plaintiff,        :
                                                :
                                                :
              -v-                               :
                                                :
NEW YORK CITY HEALTH AND                        :
HOSPITAL'S CORPORATION, et al.,                 :
                                                :
                              Defendants.  :
-------------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: APR 1 5 2014
```

12 Civ. 8762 (KBF)

OPINION & ORDER

KATHERINE B. FORREST, District Judge:

On November 9, 2012, plaintiff Maxie James ("plaintiff" or "James") filed an action in the Supreme Court of the State of New York, County of the Bronx, against defendants New York City Health and Hospital's Corporation ("HHC"), Officer Roosevelt Purvis ("Purvis"), and Lieutenant Maritza Galarza ("Galarza").  (Notice of Removal, Ex. A, Dec. 3, 2012, ECF No. 1.)  Plaintiff contends defendants engaged in discrimination and subjected plaintiff to different terms and conditions of employment because of her gender, subjected her to a hostile work environment because of her gender, retaliated against her because she complained about the alleged discrimination, and violated her equal protection rights.  (See Notice of Removal, Ex. A.)  Plaintiff also alleges HHC, through the actions of its agent and employee Officer Purvis, assaulted her.  (Id.)  The Complaint alleges violations of Title VII, 42 U.S.C. §§ 2000e, et seq., the New York State Human Rights Law,

1

Executive Law §§ 292-96, the Administrative Code of the City of New York, and 42 U.S.C. § 1983 for violations of the 14th Amendment of the U.S. Constitution. (Id.)

Defendants have now moved for summary judgment on all claims. For the reasons set forth below, defendants' motion for summary judgment is GRANTED.

## I.   FACTUAL BACKGROUND

The following facts are either undisputed or taken in the light most favorable to plaintiff. See Jaegly v. Couch, 439 F.3d 149, 151 (2d Cir. 2006).[1]

### A.   The Alleged Incident

Beginning in 2000, plaintiff was a Special Officer in the Hospital Police Department at Lincoln Hospital, which is operated by HHC. (Defs.' R. 56.1 Stmt. ¶¶ 2-4, 10, Nov. 25, 2013, ECF No. 19.) On Sunday, March 11, 2012 at 7:45 a.m., plaintiff arrived in the Central Operations room to begin her usual shift ("Tour 2"); the shift ran from 7:30 a.m. to 4:00 p.m. (Defs.' R. 56.1 Stmt. ¶¶ 13, 21, 23, 27.) Plaintiff was assigned to the "R2" post, which meant she was responsible for assisting the officer assigned to the "Central" post in the Hospital Police's Central Operations room. (Id. ¶¶ 23-24.)[2]

---

[1] Certain of defendants' factual contentions are neither admitted nor denied by plaintiff. The Court deems those paragraphs admitted. See Local Civ. R. 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party.").

[2] The R2 post was also responsible for relieving other on-duty Special Officers. (Defs.' R. 56.1 Stmt. ¶ 24.)

When plaintiff arrived in the Central Operations room, she encountered Special Officers Naste, Smith, and Purvis. (Id. ¶ 29.) Officer Smith left the room shortly after plaintiff's arrival (id. ¶ 29); Officer Naste was checking the equipment in the room because he was beginning his shift, and Officer Purvis was completing paperwork because he had just finished his shift and was preparing to begin an overtime shift. (Id. ¶¶ 30-31.)

Officer Purvis had his memo book and eyeglasses case on a work desk. (Id. ¶ 32.) Plaintiff noticed the eyeglasses case, which had a pair of sunglasses and a note inside of it; plaintiff leaned over to inspect the note, and Officer Purvis said: "Don't touch what doesn't belong to you." (Id. ¶¶ 33-35.)

Plaintiff reached for the glasses and attempted to read the note, at which point Officer Purvis used his hand to make physical contact with plaintiff's face. (Id. ¶¶ 36-37; Pl.'s R. 56.1 Stmt. ¶¶ 9-11, Dec. 20, 2013, ECF No. 28.) Plaintiff alleges the physical contact amounted to an open-handed slap, "caus[ing] [plaintiff] to have pain in her face" and having an impact "sufficient to make [plaintiff's] glasses 'shift' to the 'other side of her face.'" (Pl.'s R. 56.1 Stmt. ¶¶ 9-11, 19.) According to plaintiff, Officer Purvis said, "I kind of enjoyed that," after slapping her. (Id. ¶ 23.) The parties agree plaintiff said "at least fix my glasses" to Officer Purvis following the incident. (Defs.' R. 56.1 Stmt. ¶ 40.)[3]

---

[3] A closed-circuit security video recording captured the incident and a copy of that recording was included in defendants' summary judgment papers. (See Declaration of Laura C. Rowntree in Support of Defendants' Motion for Summary Judgment ("Rowntree Decl."), Ex. J, Nov. 25, 2013, ECF No. 18.)

At 9:18 a.m., plaintiff notified her supervisor, Lieutenant Galarza, of the incident. (Id. ¶ 42.) Plaintiff testified at her deposition that Lieutenant Galarza appeared "alarmed" when plaintiff reported the incident and asked plaintiff if she was okay. (Id. ¶¶ 43-44.) According to Lieutenant Galarza, plaintiff said she was okay. (Id. ¶ 44.) Lieutenant Galarza and plaintiff proceeded to the Central Operations room and viewed the closed-circuit video recording of the incident. (Id. ¶ 46.) Lieutenant Galarza asked plaintiff how she wanted to proceed; plaintiff said she wanted to fill out a workplace violence report, which she then did. (Id. ¶¶ 46, 49.) According to plaintiff, Lieutenant Galarza also told plaintiff it was not that serious and asked if she needed a bodyguard. (Pl.'s R. 56.1 Stmt. ¶ 30.)

At 12:30 p.m., Lieutenant Galarza notified Captain Santiago of the incident. (Defs.' R. 56.1 Stmt. ¶ 50.) According to plaintiff, Captain Santiago did not inform the Administrator on Duty ("AOD") about the incident. (Pl.'s R. 56.1 Stmt. ¶¶ 33-40.)[4]

At 1:00 p.m., Lieutenant Galarza directed Sergeant Lazzarini to inform Officer Purvis that plaintiff had accused him of workplace violence and to have him

---

[4] Plaintiff contends that the AOD on March 11, 2012 during Tour 2 was Shereen Margolis, who testified that she "should have been told" about the incident and that the failure to report the incident to the AOD was "a failure or omission of administrative policy." (Pl.'s R. 56.1 Stmt. ¶¶ 34-37.) In response, defendants argue: "For factual support, [p]laintiff repeatedly cites to the testimony of a former AOD, who may personally believe that Lieutenant Galarza should have called an AOD and completed risk management forms, but that AOD was not testifying in an official capacity, she was not offered as an FRCP 30(b)(6) witness, and she cited to no official policy or procedure from which there could be a deviation." (Defs.' Reply at 6 n.8, Jan. 13, 2014, ECF No. 29.)

4

report to her. (Defs.' R. 56.1 Stmt. ¶ 52.) Officer Purvis reported to Lieutenant Galarza and told her about the incident; Officer Purvis said he did not intend to hurt plaintiff. (Id. ¶ 53.) Lieutenant Galarza prepared a Request for Disciplinary Action. (Id. ¶ 57.)

Toward the end of plaintiff's shift, plaintiff requested a referral to the emergency room, which she received at 4:04 p.m. (Id. ¶ 58.) Plaintiff was seen by a medical professional in the emergency room and was discharged at 6:32 p.m. (Id. ¶ 61.) Plaintiff drove home with her boyfriend, Peter Captenaos, and told him what had happened. (Id. ¶ 62.)

The following day, Monday, March 12, 2012, at approximately 8:35 a.m., Captain Santiago spoke with Guillermo Magdaleno, the Director of Hospital Police, about the incident. (Id. ¶ 63.) Plaintiff contends that at the supervisor's meeting that morning, the incident was "made fun of as Bobby Brown and Whitney Houston and Tina Turner." (Pl.'s R. 56.1 Stmt. ¶ 48.)

At 11:32 a.m., Capetanos, who worked an Emergency Medical Technician with the New York City Fire Department, approached Officer Purvis at his post in the Emergency Room, said, "[Y]ou slapped my girl, Purvis," and attacked Officer Purvis. (Defs.' R. 56.1 Stmt. ¶¶ 68-69.) Capetanos was arrested and taken to the 40th Precinct of the New York City Police Department for processing. (Id. ¶ 70.)

At 12:20 p.m., plaintiff requested and was given a second referral to go to the emergency room. (Id. ¶ 73.) Plaintiff called 911 while in the emergency room, and at approximately 1:26 p.m., two NYPD officers responded to plaintiff's call. (Id. ¶¶

5

74, 76.)[5] After plaintiff spoke with the NYPD officers about her incident with Officer Purvis, Captains Padilla and Santiago suggested to plaintiff that she take some time off work, which she accepted. (Id. ¶ 81.) Plaintiff took leave from March 14, 2012 until March 23, 2012. (Id. ¶ 82.)

B. Aftermath

Officer Purvis was on medical leave following the attack by Capetanos from March 13, 2012 until October 11, 2012. (Id. ¶ 72; Pl.'s R. 56.1 Stmt. ¶ 50.) While Officer Purvis was on leave, he frequently was at Lincoln Hospital. (Defs.' R. 56.1 Stmt. ¶¶ 95-96; Pl.'s R. 56.1 Stmt. ¶ 61.) Defendant and plaintiff disagree about whether Officer Purvis interacted with plaintiff on these occasions. (Compare Defs.' R. 56.1 Stmt. ¶ 97 with Pl.'s R. 56.1 Stmt. ¶¶ 62-73.) According to plaintiff, she had a number of interactions with Officer Purvis. (Pl.'s R. 56.1 Stmt. ¶¶ 62-73.) According to plaintiff, "they kept posting [plaintiff] to areas where they knew [Officer Purvis] would be;" Officer Purvis "would come to where [plaintiff] was assigned;" Officer Purvis yelled in plaintiff's ear; Officer Purvis gave plaintiff "menacing look[s];" and when plaintiff notified her supervisors and HR about the incidents, she contends no action was taken. (Id.)

Additionally, according to plaintiff, a male colleague (Officer Ervin) told plaintiff that "the male officers did not want me there. They wouldn't watch my

---

[5] At her deposition, plaintiff explained that she called 911 "[b]ecause I was assaulted the day before. If they were going to arrest Peter [Capetanos] for assaulting him – I didn't get to do it . . . to call them. I was going to call them before my tour was over . . . [o]n the 12th." (Defs.' R. 56.1 Stmt. ¶ 75.)

back.  They wouldn't respond to service calls if I needed additional officers."  (Id. ¶ 57.)  Plaintiff contends this "warning" was on behalf of the male officers at Lincoln. (Id. ¶ 57.)  Plaintiff also alleges she was told by one of her supervisors, Sergeant Woodfine, that she "needed to be careful" because Purvis "lives around [Lincoln Hospital]" and "knows these people in the projects [around Lincoln Hospital]."  (Id. ¶ 56.)  Plaintiff asserts these comments caused her to feel "afraid."  (Id.)

When Officer Purvis returned from leave on October 11, 2012, plaintiff orally requested a transfer and thereafter, submitted a written transfer request.  (Id. ¶ 76.)  According to plaintiff, these transfer requests were never addressed.  (Id. ¶¶ 78-81.)  The Equal Employment Opportunities ("EEO") officer at Lincoln Hospital, Jorge Vidro, allegedly told plaintiff "not to say anything and to keep [the incident] quiet."  (Id. ¶ 81.)

Plaintiff took paid leave from December 15, 2012 through January 2, 2013 and leave under the Family and Medical Leave Act ("FMLA") from January 3, 2013 to March 10, 2013 and again from March 26, 2013 through September 13, 2013 because she "did not feel safe" and was "afraid."  (Id. ¶ 55; Defs.' R. 56.1 Stmt. ¶¶ 99-100.)[6]

On April 15, 2013, plaintiff was transferred at her request from Lincoln Hospital to a different hospital.  (Defs.' R. 56.1 Stmt. ¶ 103.)  She returned to work in May 2013.  (Id. ¶ 104.)

---

[6] In January 2013, plaintiff enrolled in Hostos Community College.  (Defs.' R. 56.1 Stmt. ¶ 101.)

7

C. Plaintiff's Alleged Injuries

The day after the incident,[7] and thereafter from March or April 2012 until September 2012, plaintiff sought care from her primary care physician and from a psychiatrist for migraines, difficulty sleeping, and feelings of fear, anxiety, and sadness. (Pl.'s R. 56.1 Stmt. ¶¶ 51- 53.) After that, plaintiff was treated by another medical professional because she contends had difficulty maintaining her attention span. (Id. ¶ 54.)[8]

II.    PROCEDURAL HISTORY

On March 19, 2012, plaintiff filed a complaint with the New York State Department of Labor, Public Employee Safety and Health Bureau ("PESH"). (Defs.' R. 56.1 Stmt. ¶ 114.) Plaintiff alleged: (1) HHC had failed to enforce its Workplace Violence Prevention Program; (2) she had been assaulted by a co-worker on March 11, 2012 and that both employees had remained at work for approximately two days after the incident; and (3) her co-worker had assaulted other female Hospital Police officers in the past. (Id. ¶ 115.) According to defendants, PESH conducted an investigation and determined plaintiff's allegations "Not Sustained." (Id. ¶¶ 116- 119.)

On March 14, 2012, plaintiff filed a verified Complaint with the New York State Division of Human Rights ("SDHR"). (Id. ¶ 119.) On September 12, 2012, the

---

[7] Plaintiff's Rule 56.1 Statement sometimes uses the year 2013 when the correct year appears to be 2012.
[8] Plaintiff allegedly told one of her treating mental health professionals that she suffered "stress" injuries to her head, neck, back, and shoulders, such as "headaches, [and] pain in the neck, back, and shoulders." (Pl.'s R. 56.1 Stmt. ¶ 58.)

SDHR issued a Determination and Order of Dismissal for Administrative Convenience because plaintiff intended to pursue the matter in court. (Id. ¶ 120.) On October 3, 2012, the EEOC issued a Dismissal and Notice of Rights (again, because plaintiff sought to file a lawsuit). (Id. ¶ 121.)[9]

Plaintiff also filed a claim with the State of New York Workers' Compensation Board. (Id. ¶ 123.) The Board found that plaintiff experienced a work-related injury, post-traumatic stress disorder, on March 11, 2012 that caused her to miss 13.4 weeks of work. (Id.; Pl.'s R. 56.1 Stmt. ¶ 88.)

On November 9, 2012, plaintiff commenced this action by filing a Complaint in the Supreme Court of the State of New York, County of Bronx. On December 3, 2013, defendants removed the action to this Court. (ECF No. 1.)

On January 24, 2013, defendants answered plaintiff's Complaint (ECF No. 4), and on February 14, 2013, they filed an amended Answer. (ECF No. 6.) On June 6, 2013, this action was reassigned from The Honorable Thomas P. Griesa to the undersigned. (ECF No. 8.) On November 25, 2013, defendants filed the motion for summary judgment currently pending before this Court. (ECF No. 16.) That motion became fully briefed on January 13, 2014. (ECF No. 29.)

---

[9] On April 23, 2012, plaintiff filed a Notice of Claim to recover damages from HHC and its agents and employees. (Defs.' R. 56.1 Stmt. ¶ 122.)

III.  DISCUSSION

A. Legal Standard for Summary Judgment

Summary judgment may not be granted unless all of the submissions taken together "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In making that determination, the court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010).

Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set out specific facts showing a genuine issue for trial," and cannot "rely merely on allegations or denials" contained in the pleadings. Fed. R. Civ. P. 56(e); see also Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009). "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks, alteration, and citation omitted).

Only disputes over material facts – i.e., "facts that might affect the outcome of the suit under the governing law" – will properly preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Matsushita

10

Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (stating that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts").

    "Summary judgment is appropriate even in discrimination cases, for, as [the Second Circuit] noted, 'the salutary purposes of summary judgment – avoiding protracted, expensive[,] and harassing trials – apply no less to discrimination cases than to . . . other areas of litigation.'" Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (quoting Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985)); see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148 (2000) (explaining that "trial courts should not treat discrimination differently from other ultimate questions of fact") (internal quotation marks and citation omitted).  Nonetheless, courts must be "particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question." Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997) (citation omitted). "Because direct evidence of an employer's discriminatory intent will rarely be found, 'affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.'" Id. (quoting Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994)).

    B. Legal Framework for Plaintiff's Title VII Claims

        i. Discrimination Claim

    Although "the central statutory purpose [of Title VII is] eradicating discrimination in employment, Title VII does not set forth a general civility code for

the American workplace." Redd v. New York Div. of Parole, 678 F.3d 166, 176 (2d

Cir. 2012) (alteration in original) (internal quotation marks and citations omitted).

"It is axiomatic that mistreatment at work . . . is actionable under Title VII only

when it occurs because of an employee's . . . protected characteristic." Brown v.

Henderson, 257 F.3d 246, 252 (2d Cir. 2001) (emphasis added).

　　　In situations in which there is no direct evidence of discrimination, Title VII

discrimination claims use the burden-shifting analysis set forth in McDonnell

Douglas Corp. v. Green, 411 U.S. 792 (1973).  Plaintiff bears the initial burden of

establishing a prima facie discrimination claim; if plaintiff meets her burden, the

production burden shifts to the employer to provide "a legitimate, clear, specific[,]

and non-discriminatory reason" for the adverse action.  Hold v. KMI-Continental,

Inc., 95 F.3d 123, 129 (2d Cir. 1996).  If the defendant meets its burden, plaintiff

must prove the legitimate non-discriminatory rationale provided by defendant is a

mere pretext.  Id.

　　　　　ii.  Hostile Work Environment Claim

　　　To prevail on a hostile workplace claim, plaintiff must prove:  (1) that she

was subjected to harassment so severe or pervasive as to alter the conditions of her

employment; (2) that she subjectively perceived the environment to be abusive; (3)

that the harassment was based on sex; and (4) that a specific basis exists for

imputing the harassing conduct to her employer.  See Desardouin v. City of

Rochester, 708 F.3d 102, 105 (2d Cir. 2013); Gorzynski v. JetBlue Airways Corp.,

596 F.3d 93, 103 (2d Cir. 2010); Donohue v. Finkelstein Mem'l Library, No. 12 Civ. 7218, 2013 WL 6588637, at *4 (S.D.N.Y. Dec. 16, 2013).

In determining whether a hostile work environment exists, a court must consider all of the circumstances. Redd, 678 F.3d at 176 ("In assessing the evidence to determine whether a rational juror could infer that a reasonable employee would have found the abuse so pervasive or severe as to alter her working conditions, especially in the context of a claim of sexual harassment, where state of mind and intent are at issue, the court should not view the record in piecemeal fashion.") (internal quotation marks and citations omitted).  Factors to consider include: "[T]he frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993).

As with discrimination claims, "[i]t is axiomatic that in order to establish a sex-based hostile work environment under Title VII, a plaintiff must demonstrate that the conduct occurred because of her sex." Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002) (quotation marks and citations omitted) (emphasis added).

According to the Second Circuit, "complaints of sexual assaults, other physical contact, whether amorous or hostile, for which there is no consent express or implied; uninvited sexual solicitations; intimidating words or acts; and obscene language or gestures" are the kinds of situations that suggest an actionable Title VII claim. Redd, 678 F.3d at 177 (alterations and citation omitted). "Occasional

13

vulgar banter, tinged with sexual innuendo, of coarse or boorish workers" is not.

Redd, 678 F.3d at 177 (internal quotation marks and citations omitted); see also

Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1988) ("Simple teasing, offhand

comments, and isolated incidents (unless extremely serious) will not amount to

discriminatory changes in the terms and conditions of employment.").  Put another

way, "[t]he kinds of workplace conduct that may be actionable under Title VII . . .

include unwelcome sexual advances, requests for sexual favors, and other verbal or

physical conduct of a sexual nature."  Redd, 678 F.3d at 175 (internal quotation

marks and citations omitted).

### iii.  Retaliation Claim

Pursuant to Title VII, an employer may not discriminate against an employee

because the employee "has opposed any practice made an unlawful employment

practice by this subchapter, or because he has made a charge, testified, assisted, or

participated in any manner in an investigation, proceeding, or hearing under this

subchapter."  42 U.S.C. § 2000e-3(a).

"A plaintiff may prevail on a claim for retaliation even when the underlying

conduct complained of was not in fact unlawful so long as he can establish that he

possessed a good faith, reasonable believe that the underlying challenged actions of

the employer violated the law."  Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d

Cir. 2002) (internal quotation marks, alteration, and citation omitted); Kelly v.

Howard I. Shapiro & Assocs. Consulting Engineers, P.C., 716 F.3d 10, 16 (2d Cir.

2013) ("'[M]ere subjective good faith belief is insufficient; the belief must be

14

reasonable and characterized by objective good faith.'") (alterations and emphasis omitted) (citing <u>Sullivan-Weaver v. New York Power Auth.</u>, 114 F. Supp. 2d 240, 243 (S.D.N.Y. 2000)).  In determining whether the complaint was objectively reasonable, the perspective of a "reasonable similarly situated person" applies.  <u>Id.</u>

Moreover, plaintiff's complaint must "have allowed her employer to have reasonably understood that [plaintiff's] opposition was directed at conduct prohibited by Title VII."  <u>Id.</u> at 17 (internal quotation marks, alterations, and citations omitted) ("Although particular words such as 'discrimination' are certainly not required to put an employer on notice of a protected complaint, neither are they sufficient to do so if nothing in the substance of the complaint suggests that the complained-of activity is, in fact, unlawfully discriminatory."); <u>see also</u> <u>Krasner v. HSH Nordbank AG</u>, 680 F. Supp. 2d 502 (S.D.N.Y. 2010) (Lynch, J.) (explaining that plaintiff's retaliation claim failed because "the overall content and context" of plaintiff's complaints did not in any way suggest that the admittedly detrimental conduct was harmful because of "a protected characteristic").

As with Title VII discrimination, retaliation claims are evaluated under a burden-shifting analysis.  <u>See, e.g.</u>, <u>Quinn v. Green Tree Credit Corp.</u>, 159 F.3d 759, 768 (2d Cir. 1998) (citations omitted).  First, a plaintiff must make out a <u>prima facie</u> case of retaliation by showing:  "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action."  <u>McMenemy v. City of Rochester</u>, 241 F.3d 279, 282-83 (2d Cir. 2001).  The

defendant then must articulate a legitimate, non-retaliatory reason for the alleged retaliatory conduct. Quinn, 159 F.3d at 768-69 (citations omitted). If defendant meets that burden, "plaintiff must adduce evidence sufficient to raise a fact issue as to whether the employer's reason was merely a pretext for retaliation." Id. (internal quotation marks, alteration, and citation omitted).

The Supreme Court recently held that "a plaintiff making a retaliation claim under [Title VII] must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." University of Texas Southwestern Medical Ctr. v. Nassar, – U.S. – , 133 S.Ct. 2517, 2534 (2013).[10] "Close temporal proximity between the plaintiff's protected action may in itself be sufficient to establish the requisite causal connection between a protected activity and retaliatory action." Kaytor v. Electric Boat Corp., 609 F.3d 537, 552 (2d Cir. 2010). Alternatively, a plaintiff may produce direct evidence of retaliatory animus against plaintiff by the defendant. See Taylor v. Seamen's Soc. For Children, No. 12 Civ. 3713, 2013 WL 6633166, at *20 (S.D.N.Y. Dec. 17, 2013) (citation omitted).

Last, the Court notes that "Title VII's anti-discrimination and anti-retaliation provisions 'are not coterminous;' anti-retaliation protection is broader and 'extends beyond workplace-related or employment-related retaliatory acts and harm.'" Hicks, 593 F.3d at 165 (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67 (2006)). Title VII's anti-retaliation provision applies to "'employer

---

[10] The Court assumes for purposes of this decision that but-for causation is required for those claims as well. See, e.g., Weber v. City of New York, No. 11 Civ. 5083, 2013 WL 5416868, at *97 n.22 (E.D.N.Y. Sept. 29, 2013).

actions that would have been materially adverse to a reasonable employee or job applicant.'" Hicks, 593 F.3d at 164 (quoting White, 548 U.S. at 57). "Actions are 'materially adverse' if they are 'harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" Id. (quoting White, 548 U.S. at 57). "[P]etty slights or minor annoyances that often taken place at work and that all employees experience" are insufficient to constitute actionable retaliation. White, 548 U.S. at 67-68.

    C. Analysis

        i. Discrimination and Hostile Work Environment Claims

In this case, there is no question whether the alleged misconduct was because of plaintiff's sex – it was not. See Schwapp, 118 F.3d at 110 ("[E]ven in the discrimination context, a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment.") (citation omitted). Accordingly, both plaintiff's sex discrimination claim and her hostile work environment claim must fail.

Plaintiff's allegations consist of the following:  (1) plaintiff was looking at Officer Purvis's belongings; he told her to stop and when she refused to do so, he slapped her and then said, "I kind of enjoyed that;" (2) plaintiff's female supervisor did not appropriately react in the immediate aftermath to the case; (3) at a supervisors meeting, the incident was jokingly analogized to famous abusive relationships; (4) Officer Purvis harassed plaintiff throughout the time he was on leave; (5) plaintiff's supervisors failed to appropriately handle the aftermath of the

incident; (6) a male colleague warned plaintiff that the male officers did not want her at Lincoln Hospital and would not provide her with backup should she need it; (7) a male supervisor warned plaintiff that she needed to be careful because of Officer Purvis's connections; and (8) plaintiff felt sad, anxious, and afraid as a result.

Taking plaintiff's allegations as true, Lincoln Hospital was an unpleasant place to work for plaintiff following the incident. She did not feel respected by her colleagues and believed her supervisors did not take her allegations seriously enough. She and Officer Purvis were not immediately separated following the incident. She encountered Officer Purvis on a handful of occasions while he was on leave and on certain occasions and felt intimidated and/or threatened by him.

There is nothing in the record beyond plaintiff's cursory allegations, however, that suggest any of defendants' alleged misconduct was because of plaintiff's sex. As an initial matter, Officer Purvis's behavior toward plaintiff was inappropriate, but no reasonable factfinder could determine it was based on sex. Officer Purvis did not make statements of an explicitly or implicitly sexual nature; his conduct was not of a sexual nature, and the circumstances surrounding the incident do not suggest they were incited because of sexual tension or a sexual rejection. This is not a situation, for example, where plaintiff refused her colleague's sexual advances and in response, he slapped her.

While plaintiff seems to suggest that Officer Purvis's statement "I kind of enjoyed that" has sex-based connotations, such utterance is insufficient to raise a

18

question of fact. See Riscili v. Gibson Guitar Corp., 605 F. Supp. 2d 558, 566 (S.D.N.Y. 2009) ("In general, a single offensive remark does not violate the law."). The question is whether there is an inference that Officer Purvis was motivated by plaintiff's sex. There is nothing in the record to suggest that his action of slapping plaintiff was based on her sex. The ex post remark does not itself raise a triable issue as to motivation. See Lioi v. New York City Dep't of Health & Mental Hygiene, 914 F. Supp. 2d 567, 586 (S.D.N.Y. 2012) ("Whether remarks by defendants or defendants' employees support an inference of discrimination depends on the context, and whether, fairly considered, these remarks are either themselves probative of discrimination, or tend to show that the decision-maker was motivated by assumptions or attitudes relating to the protected class.") (internal quotation marks, alteration, and citation omitted); see also Patane v. Clark, 508 F.3d 106, 112 (2d Cir. 2007) (affirming the district court's dismissal of plaintiff's Title VII claims because it failed to allege, for example, that defendants "made any remarks that could be viewed as reflecting discriminatory animus," or "that any male employees were given preferential treatment when compared to plaintiff").

Considering the incident in combination with the conduct that followed, the record is equally devoid of evidence that the alleged misconduct was sex-based. Indeed, while plaintiff's allegations suggest her colleagues may have behaved unprofessionally (for example, by threatening to withhold or delay backup), there is no evidence to suggest that their conduct was because of plaintiff's sex. Although plaintiff tries to make the issue into one of sex by stating her male colleagues

19

threatened withholding backup, there is nothing to suggest they did so because she was a female or because of a general animus toward women.  Similarly, plaintiff's claims that her supervisors failed to adequately react to her complaints is insufficient under Title VII because there is no evidence they did so because of plaintiff's sex.  Accordingly, the Court finds as a matter of law that plaintiff's discrimination and hostile work environment claims must fail.

      ii.  <u>Retaliation Claim</u>

As explained above, plaintiff must establish a <u>prima facie</u> case of retaliation by showing:  "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." <u>Hicks</u>, 593 F.3d at 164 (internal quotation marks and citation omitted).

Plaintiff's initial complaints about the incident focused almost exclusively on the fact that she experienced an incident of workplace violence, rather than a sex-based incident.  Neither Lieutenant Galarza's memo book entry nor the March 12, 2012 memorandum Lieutenant Galarza created for Guillermo Magdaleno, the Director of Hospital Police, referenced plaintiff suggesting she had been subjected to unlawful sex-based conduct.  (<u>See</u> Rowntree Decl., Exs. K, L.)  Even at her own deposition, plaintiff characterized the incident as one of "workplace violence," rather than one based on sex.  (Declaration of Steven T. Sledzik ("Sledzik Decl."), Ex. 1A at 35-47, 52-61.)

Nonetheless, on March 14, 2012, plaintiff filed a Verified Complaint with the New York State Division of Human Rights. (Defs.' R. 56.1 Stmt. ¶ 119; Roundtree Decl., Ex. HH.) In her Complaint, plaintiff states: "I believe [HHC] has discriminated against me because I am female." (Roundtree Decl., Ex. HH ¶ 8.) Additionally, on March 19, 2012, plaintiff filed a complaint with the PESH alleging, inter alia, that "the other Hospital Police officer has assaulted other female Hospital Police in the past." (Rowntree Decl., Ex. GG.) Based on these complaints, the Court finds plaintiff has satisfied her burden of showing she engaged in protected activity. See Hicks, 593 F.3d at 164 ("The plaintiff's burden in this regard is de minimus and the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive.") (internal quotation marks and citation omitted).

That being said, plaintiff's retaliation claim nonetheless must fail because no reasonable fact-finder could determine plaintiff experienced an adverse employment action as a result of her complaints of sex-based discrimination.

Plaintiff alleges she was victim to the following adverse employment actions because of her protected activity: (1) since lodging her complaints, plaintiff was "denied back up [and was] not [ ] provided sufficient back up," which is problematic because Special Officers are sometimes required to restrain patients with mental illness (Compl. ¶ 19; Roundtree Decl., Ex. E; Pl.'s Mem. at 17, Dec. 20, 2013, ECF No. 27); (2) other male officers told plaintiff they "do not want her there" and that

21

they will not "watch her back;" (Compl. ¶ 19); (3) plaintiff's overtime was limited and/or denied (id.); (4) defendants departed from proper procedures and protocol in dealing with the incident; (5) Officer Purvis was not punished for his conduct; (6) plaintiff was required to stand outside the roll call room by Lieutenant Galarza because Galarza believed plaintiff was late for her tour (see Roundtree Decl., Ex. NN); (7) plaintiff was criticized by a sergeant for taking an excessively long personal break (id., Ex. E at 194, 199); and (8) plaintiff requested a transfer that was not acted on "for months" (Pl.'s Mem. at 17).

The majority of plaintiff's allegations of retaliatory conduct are against her supervisors. However, plaintiff does make one claim against her male co-workers: that they threatened to delay and possibly deny her backup. As to this assertion, no evidence in the record suggests that plaintiff's co-workers had any knowledge prior to (or after) making this threat that plaintiff had engaged in protected activity. That is, that the co-workers knew and therefore could take actions in relation to a complaint of sex-based discrimination. Rather, the record illustrates plaintiff's co-workers knew only about the incident with Officer Purvis and that plaintiff's boyfriend assaulted Officer Purvis the day after the incident (and that Officer Purvis was on medical leave for six months thereafter). Accordingly, without any indication that plaintiff's co-workers knew about her protected activity – or even that they reasonably could have known about that activity – plaintiff's retaliation claim based on the threat of delayed or withheld backup on the part of her male co-workers is unavailing.

22

The remainder of plaintiff's allegations concern action and inaction by various supervisors. While here again no evidence illustrates plaintiff's supervisors knew about plaintiff's protected activity, the Court construes the facts in the light most favorable to plaintiff and thus assumes that as supervisors, they were so notified. Nonetheless, plaintiff's retaliation claim against Lieutenant Galarza and HHC must fail as to plaintiff.

First, plaintiff alleges she was denied sufficient backup following the lodging of her complaint. However, plaintiff's deposition testimony illustrates only a single instance where plaintiff perceived delay. (Roundtree Decl., Ex. E at 146.) Yet, on that occasion, the backup requested was on behalf of another officer. (Id. at 146-47.) There is no evidence in the record to suggest plaintiff herself was ever actually denied backup or that requested backup was ever delayed. (Id. at 146-47.) Accordingly, this allegation does not amount to an actionable adverse employment action.

Plaintiff's argument that HHC denied and otherwise limited her ability to obtain overtime is similarly unavailing. Defendants put forth uncontroverted evidence that plaintiff worked 16 shifts of voluntary overtime in the three-month period after her return from leave on March 23, 2012 and before her leave beginning on June 27, 2012, and that plaintiff worked three shifts of voluntary overtime in the two-and-a-half month period prior to the March 11, 2012 incident,

23

from January 1, 2012 to March 11, 2012.  (See Defs.' R. 56.1 Stmt. ¶ 98.)[11]  While plaintiff claims her concern is more specifically that she was denied overtime earnings after lodging her complaints, plaintiff puts forth no evidence in support of her allegation.  As such, this claim is insufficient to create a question of fact regarding whether plaintiff experienced an adverse employment action because of her protected activity.

Plaintiff also claims she was required to stand outside the roll call room by Lieutenant Galarza (because the lieutenant believed she was late for her tour) and that she was unreasonably criticized by a supervisor for taking an excessively long personal break.  Even if true, these allegations do not amount to adverse employment actions.  See White, 548 U.S. at 68 ("An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience.") (citation omitted).

Plaintiff further alleges defendants failed to follow the proper procedures and protocol in dealing with the incident; she also contends defendants failed to immediately remove and punish Officer Purvis for the incident.  However, "violation of an organization's internal procedures alone is insufficient to create an inference of discrimination [or retaliation]." Petrovits v. New York City Transit Auth., No. 95

---

[11] Plaintiff neither admits nor denies this factual assertion; accordingly, the Court deems it admitted.  See Local Civ. R. 56.1(c).

Civ. 9872, 2002 WL 338369, at *8 (S.D.N.Y. Mar. 4, 2002) (citation omitted).[12]  Not only that, in support of her position, plaintiff cites the testimony of a former AOD officer.  As defendants explain, "that AOD was not testifying in an official capacity, she was not offered as a FRCP 30(b)(6) witness, and she cited to no official policy or procedure from which there could be a deviation."  (Defs.' Reply at 6.)  See Jones v. New York City Health & Hospital Corp., 102 Fed. App'x 223, 226 (affirming the district court's grant of summary judgment for defendant in part because plaintiff "provided no evidence – aside from her doubtful assertion that HHC failed to follow its own procedures – to sustain [her] claim" of retaliation).  And most importantly, defendants' conduct immediately following the incident preceded plaintiff's protected activity.  Thus, it cannot possibly have been in retaliation for plaintiff's complaints.  See Oluyomi v. Napolitano, 811 F. Supp. 2d 926, 947 (S.D.N.Y. 2011) (explaining that "even if there had been a delay in seeking [plaintiff's] response to the allegation [in violation of protocol], [plaintiff] has failed to connect any such delay to his prior [protected] activity").

With respect to plaintiff's contention that the Labor Relations department took eight months to issue charges against Officer Purvis and revoked those charges one week later (see Pl.'s Mem. at 9), here too plaintiff fails.  First, the Second Circuit has determined that "at least in a run-of-the-mine case . . ., an employer's failure to investigate a complaint of discrimination cannot be considered an adverse

---

[12] "Failure to follow internal procedures can, however, 'be evidence of pretext.'" Petrovits,  2002 WL 338369, at *8 (quoting Stern v. Trustees of Columbia Univ., 131 F.3d 305, 313 (2d Cir. 1997)).

employment action taken in retaliation for the filing of the same discrimination complaint." Fincher v. Depository Trust & Clearing Corp., 721 F.3d 712, 721 (2d Cir. 2010) (internal quotation marks and citation omitted) (explaining that a contrary rule would have "odd consequences" because in such situation, "[a] person not in fact discriminated against could complain of discrimination nonetheless" and if the employer were to decline to investigate the (false) claim, the employee might have an actionable retaliation lawsuit for failure to investigate). Not only that, there is no causal connection between the purported delay and plaintiff's complaints. Officer Purvis was on medical leave for six months following the incident; two months after his return, plaintiff herself took an extended leave of absence. On these facts, no reasonable fact-finder could determine the delay was in retaliation for plaintiff's conduct. Moreover, plaintiff has not put forth a shred of evidence to suggest that HHC's withdrawal of the charges against Officer Purvis was in retaliation for plaintiff's complaint. Accordingly, plaintiff's allegations on this point are insufficient.

Plaintiff's last claim concerns her request for a transfer in the fall of 2012;[13] the transfer request was not granted until April 2013. (Defs.' Reply at 7-8.) Plaintiff states that she first made her request orally to the individual in charge of the EEO department, Jorge Vidro. (See Sledzik Decl., Ex. 1 at 151.) According to

---

[13] The record is unclear as to whether plaintiff first made this request in September (see Defs.' Reply at 7-8) or October (see Pl.'s R. 56.1 Stmt. ¶ 76.) Plaintiff testified at her deposition that she does not remember precisely when she first requested the transfer. (Sledzik Decl., Ex. 1 at 150.)

plaintiff, Vidro "said he would work on it and [ ] would get back to" her. (Id.)

Plaintiff states that she did not hear back or follow up with Vidro for a month, at

which point she submitted a written transfer request (the letter is dated October 17,

2012). (Id. at 152-53, 160.) With the exception of a brief, casual conversation with a

sergeant soon thereafter, plaintiff did not speak with anyone else about the request

until it was honored in April 2013. (Id. at 162-63.)

These facts, without more, are insufficient to create a question of fact

regarding whether plaintiff's request was not immediately honored <u>because of</u>

<u>plaintiff's protected activity</u>. First, plaintiff went on leave approximately two

months after filing the letter. She did not return until March 10, 2013; she left

again March 26, 2013 and that leave did not end until September 13, 2013. Second,

the temporal proximity of plaintiff's protected activity to the initial request for a

transfer is insufficient as circumstantial evidence of the required but-for causation.

See <u>Clark Cnty. School Dist. v. Breeden</u>, 532 U.S. 268, 273-74 (2001) (explaining

that temporal proximity must be "very close" and approving of a case that deemed a

three-month period insufficient); <u>Murray v. Visiting Nurse Servs. of N.Y.</u>, 528 F.

Supp. 2d 257, 275 (S.D.N.Y. 2007) (explaining that "district courts within the

Second Circuit have consistently held that the passage of two to three months

between the protected activity and the adverse employment action does not allow

for an inference of causation") (citing cases); <u>but see</u> <u>Gorzynski v. JetBlue Airways</u>

<u>Corp.</u>, 596 F.3d 93, 110-11 (2d Cir. 2010) ("Though [the Second Circuit] has not

drawn a bright line defining, for the purposes of a <u>prima facie</u> case, the outer limits

beyond which a temporal relationship is too attenuated to establish causation, [the Second Circuit has] previously held that five months is not too long to find the causal relationship"). Accordingly, this allegation too fails to support a claim for retaliation.

Since plaintiff has failed to allege a single adverse employment action causally connected to plaintiff's protected activity, plaintiff's retaliation claim must fail. Indeed, even taking plaintiff's contentions together, insufficient evidence suggests defendants engaged in retaliatory conduct because of plaintiff's complaints.

D. State and City Claims

Plaintiff also brings her claims under state and city human rights laws. With the exception of the NYCHRL claims, those claims are "subject to the same standard of proof as plaintiff's Title VII claims" and thus do not require separate analysis. Soliman v. Deutsche Bank AG, No. 03 Civ. 104, 2004 WL 1124689, at *8 n.2 (S.D.N.Y. May 20, 2004). However, "the applicable standard . . . is different from the Title VII standard" for plaintiff's city law claims, Lioi, 914 F. Supp. 2d at 594; see also Bermudez v. City of New York, 783 F. Supp. 2d 560, 579 (S.D.N.Y. 2011), and must be analyzed "separately and independently from any federal and state law claims." Mihalik v. Credit Agricole Cheureux N. Am., Inc., 715 F.3d 102, 109 (2d Cir. 2013) (citations omitted) ("Thus, even if the challenged conduct is not actionable under federal and state law, federal courts must consider separately whether it is actionable under the broader New York City standards.").

28

"The [New York City Human Rights Law] imposes liability for harassing conduct that does not qualify as 'severe or pervasive,' and questions of 'severity' and 'pervasiveness' are applicable to consideration of the scope of permissible damages, but not to the question of underlying liability." Bermudez, 783 F. Supp. 2d at 579 (internal quotation marks and citation omitted). Therefore, in order to survive summary judgment based on the NYCHRL, plaintiff must put forth evidence of "the existence of unwanted gender-based conduct." Id. (internal quotation marks and citation omitted). Put another way, to prevail on a sex discrimination claim under the NYCHRL, a "plaintiff need only show differential treatment – that she is treated 'less well' – because of a discriminatory intent." Mihalik, 715 F.3d at 110 (explaining that the challenged conduct not need not be "tangible (like hiring or firing)") (internal quotation marks and citation omitted). However, the Second Circuit warns that "district courts must be mindful that [like Title VII,] the NYCHRL is not a general civility code." Id. (internal quotation marks and citation omitted).

In this case, plaintiff's discrimination and hostile work environment NYCHRL claims fail for the same reason her state and federal law claims are insufficient: there is no triable issue regarding whether defendants' alleged misconduct was based on her sex. Id. at 111 (explaining that a court should look at the entirety of the circumstances and noting that "[a]lthough the First Department has observed that a jury is often best suited to make this determination," "summary judgment can still be an appropriate mechanism for resolving NYCHRL claims.").

29

As for plaintiff's NYCHRL retaliation claim, "summary judgment is appropriate only if the plaintiff cannot show that retaliation played any part in the employer's decision." Mihalik, 715 F.3d at 116.  Like under Title VII, a plaintiff must establish a causal connection between her protected activity and the alleged retaliatory conduct.  Id. at 112 ("a defendant is not liable if the plaintiff fails to prove the conduct is caused at least in part by discriminatory or retaliatory motives").  Thus, for the same reason plaintiff's Title VII retaliation claim fails, so too does her NYCHRL retaliation claim.

E. Section 1983 Claim

Section 1983 grants a cause of action against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage of any State," violates the constitutional rights of an individual.  42 U.S.C. § 1983.  "[S]ex-based discrimination may be actionable under [Section] 1983 as a violation of equal protection" if the action was taken under color of state law.  Demoret v. Zegarelli, 451 F.3d 140, 149 (2d Cir. 2006).  Beyond the requirement that the individual be acting under color of state law, "the analysis for such claims is similar to that used for employment discrimination claims under Title VII."  Id.  Accordingly, because plaintiff has failed to allege a triable issue of fact regarding whether Officer Purvis engaged in sex-based misconduct in violation of Title VII, she too has failed to make out a claim against Officer Purvis under Section 1983.

To hold HHC liable under Section 1983, plaintiff cannot sue "for an injury inflicted solely by its employees or agents," but rather must identify a "policy or

custom, whether made by its lawmakers or those whose edicts or acts may fairly be said to represent official policy," pursuant to which defendants inflicted the alleged injury. Monell v. Department of Social Servs., 436 U.S. 658, 694 (1978); see also Oklahoma v. Tuttle, 471 U.S. 808 (1985). Thus, plaintiff must both "prove the existence of a municipal policy or custom" and "establish a causal connection – an affirmative link – between the policy and the deprivation of [ ] constitutional rights." Vippolis v. Haverstraw, 768 F.2d 40, 44 (2d Cir. 1985) (internal quotation marks omitted).

Plaintiff contends she has illustrated a triable issue of fact regarding whether HHC had a policy or practice of failing to investigate and address complaints and discrimination and harassment based on the following allegations: (1) plaintiff was slapped by Officer Purvis; (2) the AOD was not informed of the incident; (3) proper risk management forms were not filed following the incident; (4) plaintiff complained to human resources and her supervisors and they did nothing; at one point, she was told by a supervisor to keep the assault quiet; (5) disciplinary charges against Officer Purvis were never pursued; (6) plaintiff since became aware of other incidents of harassment by Officer Purvis and other male employees (see Pl.'s R. 56.1 Stmt. ¶¶ 89-101); (7) more than 50 other harassment claims have been made at Lincoln Hospital over the course of the last five years; only one resulted in discipline against the alleged wrongdoer; and (8) HHC took no steps to separate Officer Purvis from plaintiff following the incident, contrary to its own policies. (Pl.'s Mem. at 21.)

Plaintiff's Rule 56.1 Statement includes statements from Vanessa Schoening, an Emergency Medical Technician with the New York City Fire Department, who was assigned to Lincoln Hopsital from 2006 to 2010. (Pl.'s R. 56.1 Stmt. ¶ 98.) Schoening describes Officer Purvis "as being aggressive with her about her personal life." (Id. ¶ 99.) According to plaintiff, Schoening stated Officer Purvis "would ask her out, told her she was beautiful and would put his arm around her, tell her (*sic*) had a foot fetish, asked her to have a sexual relationship with him 'countless' times." (Id.) Schoening testified that Purvis's supervisors and co-workers observed these interactions and ignored them, and said that she did not complain because "that was not the way things ran in that area;" she thought she would be ignored or retaliated against. (Id. ¶¶ 100-01.)

In response, defendants contend that plaintiff's factual record on this point must be rejected because "there is no admissible evidence that these events occurred or that HHC was aware of them." (Defs.' Reply at 8-9.) Defendants also argue that the testimony of an emergency medical technician "not similarly situated to [p]laintiff" who "did not experience any treatment similar to [p]laintiff" and who "never reported Purvis'[s] conduct" does not create a triable issue of fact in this case. (Id. at 9 (clarifying that Schoening did not testify whether Purvis's supervisors saw the alleged conduct; she merely stated that there were sergeants who "would be around the same floor").) Defendants also reject the statistics put forth by plaintiff, stating that plaintiff "misrepresented statistical information of Lincoln Hospital's [EEO] office" and "has conflated the work of the EEO office – which documents and

investigates complaints of EEO violations, most of which are never substantiated –
with the work of Labor Relations, which is responsible for employee discipline." (Id.
(internal citation omitted).)

As already explained, there is no indication in the record that the misconduct
allegedly engaged in by defendants (and plaintiff's other co-workers and
supervisors) had anything to do with plaintiff's sex. Additionally, to the extent that
plaintiff argues defendants' treatment of her situation is evidence of a policy and
practice of failing to investigate and address claims of discrimination, her claim
must fail. Plaintiff's evidence fails to establish "that a policymaking official had
notice of a potentially serious problem of unconstitutional conduct, such that the
need for corrective action or supervision was obvious." Amnesty Am. v. Town of W.
Hartford, 361 F.3d 113, 128 (2d Cir. 2004) (internal quotation marks and citation
omitted) (emphasis added). Indeed, as defendants contend, there is no admissible
evidence to suggest HHC was aware of the incident between Officer Purvis and
Schoening, let alone that they had such information and chose to ignore it in a way
that amounted to a policy or practice of the department. Id. (explaining that "mere
negligence or bureaucratic inaction," without more, is insufficient for an actionable
deliberate indifference for failure to investigate claim). Accordingly, plaintiff's
allegation that HHC had a policy and practice of failing to investigate and address
claims of discrimination must fail. See, e.g., Patterson, 375 F.3d at 227 ("[W]e
cannot see in the record admissible evidence from which a rational factfinder could
find that racial harassment . . . or discrimination . . . was so widespread as to

33

permit an inference that the Department had a policy or custom of such harassment. Although [plaintiff] alleged that these practices were pervasive, that assertion is conclusory, and he failed to support it with evidence of specific facts.").

F. Assault Claim

Plaintiff's assault claim, which she asserts only against HHC (see Compl. ¶ 41), is also unavailing because there is no dispute that Officer Purvis was not acting in the scope of his employment or at the direction of his supervisors when he allegedly slapped plaintiff.

Section 11 of the New York Workers' Compensation Law requires that workers' compensation be the exclusive remedy for an injury that occurs at work. N.Y. Comp. Law § 11. While an employer's intentional torts are exempt from Section 11, "[i]t is important to note that the requisite 'intent' or 'willfulness' must stem from the employer, not merely from a co-employee." Bass v. World Wrestling Fed'n Entm't, 129 F. Supp. 2d 491, 508 (E.D.N.Y. 2001) (citations omitted); see also Carnegie v. J.P. Phillips, Inc., 815 N.Y.S.2d 107, 108-09 (2d Dep't 2006) ("An employer is vicariously liable for its employees' torts, even where the offending employee's conduct was intentional, if the acts were committed while the employee was acting within the scope of his or her employment," but "the employer bears no vicarious liability where the employee committee the tort for personal motives unrelated to the furtherance of the employer's business" or in situations in which "the employee's tortious conduct could not have been reasonably expected by the employer").

34

In this case, because Officer Purvis is plaintiff's co-worker rather than her employer, plaintiff's assault claim against HHC fails as a matter of law.

G. Disqualification of Defendants' Counsel

Plaintiff contends defendants' counsel must be disqualified because HHC argues Officer Purvis was acting outside the scope of his authority to the detriment of the individual defendants. (Pl.'s Mem. at 3-4.) In response, defendants argue that disqualification is unjustified because there is no conflict. (Defs.' Reply at 4.) In particular, defendants note that Officer "Purvis had never suggested that he made contact with [p]laintiff on March 11, 2012 in the scope of his employment or pursuant to policy . . . ." (Id.) The Court finds there is no conflict between the defendants for just this reason, and accordingly, rejects plaintiff's suggestion that defendants' counsel should be disqualified.

IV.  CONCLUSION

For all of the aforementioned reasons, defendants' motion for summary judgment is GRANTED. The Clerk of Court is directed to close the motion pending at ECF No. 16 and to terminate this action.

SO ORDERED.

Dated:      New York, New York
            April 14, 2014

                                    _____
                                    KATHERINE B. FORREST
                                    United States District Judge